Linnie F. Valentine appeals from the trial court's summary judgment in favor of the defendant, Richard L. Watters. We reverse and remand.
On June 24, 1988, Valentine underwent bilateral breast-implant surgery. The implants later caused problems, including pain, hardness, discoloration, swelling, and leakage. Valentine consulted attorney Richard Watters about pursuing litigation. Valentine and Watters dispute the substance of their conversation at that consultation. Valentine states that Watters represented to her that he was very familiar with litigation regarding breast implants and that he had represented several clients in breast-implant litigation. She further claims that Watters's statements to that effect "enticed" her to hire him. (Valentine's brief, pp. 5-6.) She states that it was not until Watters's deposition in this case that she learned that he had not represented any client in litigation regarding breast implants. Watters denies that he told Valentine that he had represented other clients in breast-implant litigation; he states that he told her that he had represented other clients in products-liability actions. Valentine claims that if she had known that Watters had had no experience representing clients in breast-implant litigation, she would not have hired him to represent her.
On January 1, 1993, Valentine and Watters entered into a retainer agreement pursuant to which Watters agreed to represent Valentine in her litigation regarding her breast implants. On November 23, 1993, Watters, on Valentine's behalf, sued Medical Engineering Corporation, the manufacturer of the breast implants, in the Mobile Circuit Court. Thereafter, the case was removed to federal court; the action was later stayed and consolidated with a class-action suit in the United States District Court for the Northern District of Alabama. Valentine agreed to consolidate her case with the class action. In her briefs before this Court and in the record, Valentine consistently refers to the class-action suit and the offices responsible *Page 387 
for processing her settlement collectively as the Multi-District Breast Implant Litigation ("the MDL"); for purposes of this opinion, we will do the same.
Valentine claims that she contacted Watters's office frequently to inquire about the status of her case and that Watters's office "repeatedly advised [her] that everything was fine and that the papers had been filed." (Valentine's brief, p. 7.) Valentine states that, in September 1996, she received a telephone call from Watters in which he informed her that the claims administrator's office that was managing the class-action suit "had lost her papers and that she needed to come in and sign a new document." Id. Thereafter, Valentine met Watters at his office and signed a new registration form for participation in the MDL settlement program. She states that Watters assured her that everything was in order and that she would be receiving her portion of the settlement soon. Valentine states that this meeting occurred after the deadline for filing an election to participate in the class action had passed.
Valentine states that in December 1996 she met with Watters, and he again advised her "that the [office managing the] MDL had lost her file and all her paperwork." Id. Watters gave Valentine a handwritten note stating that he would try to find someone else in the Mobile County area who would help straighten out her problems. Valentine requested that Watters give her her file. He did, and, after reviewing her file, she noticed that "the Court had mailed several papers to Mr. Watters that included deadline dates required by the MDL." (Valentine's brief, p. 8.) Valentine concluded that Watters had failed to file any documents before those deadlines. On December 12, 1996, Valentine went back to Watters's office. She claims that Watters again told her that he had filed her paperwork, that the office managing the MDL had lost her paperwork, and that she would be classified as a "late registrant." According to Valentine, when her husband asked Watters to produce copies of the documents he had filed on her behalf for participation in the class-action suit, Watters admitted to Valentine that he had not filed the paperwork. Watters states in an affidavit that he "filled in all forms that [he] received and sent them in."
On September 9, 1997, Valentine filed an action against Watters, alleging legal malpractice, misrepresentation, and negligent misrepresentation. Valentine argues that Watters breached the legal duty owed her and that he failed to use the requisite degree of care, skill, and diligence in seeing to the timely filing of her claim so as to be included as a class member in the MDL. Valentine further alleges in her complaint that Watters knowingly made false representations to her, that she relied on those representations, and that she suffered damages as a result of her reliance.
The trial court appointed James Lynn Perry as special master to determine the difference between the benefits that would have been afforded to Valentine as a current registrant in the MDL and those afforded to her as a late registrant. Perry concluded that as a "late registrant" Valentine was not entitled to the same benefits she would have received as a "current registrant."[1] *Page 388 
On November 15, 1999, Valentine moved for a summary judgment.[2] Based on a recommendation of the Mobile Bar Association, Valentine consulted with Kent McPhail, an attorney with experience in breast-implant litigation, to investigate whether Valentine could recover under the MDL as a "late registrant." McPhail attempted to secure benefits as a current registrant for Valentine but was not successful.
On March 3, 2000, Valentine identified McPhail as her only expert witness in her legal-malpractice action against Watters. McPhail gave a sworn statement in which he stated his opinion that Watters violated the applicable standard of care in Valentine's case. Watters sought to discover McPhail's case files and the names of the other clients he represented in breast-implant litigation. McPhail refused, contending that that information was privileged and confidential. On October 12, 2002, the trial court ordered Valentine to provide Watters a list of McPhail's breast-implant-litigation clients. At that point, McPhail declined to testify as Valentine's expert witness. On December 10, 2002, Valentine sent a letter to the trial court removing McPhail as an expert witness; however, she reserved the right to call him as a fact witness.
On February 21, 2003, Watters moved for a summary judgment and argued that the Alabama Legal Services Liability Act, § 6-5-570
et seq., Ala. Code 1975 ("the ALSLA"), requires Valentine to support her claims with testimony from an expert witness. Watters also argued that a summary judgment was appropriate as to Valentine's misrepresentation and negligent-misrepresentation claims, because she had not shown that Watters's alleged misrepresentation caused her to be classified as a "late registrant" in the MDL. In support of his motion for a summary judgment, Watters attached his own affidavit. He stated in his affidavit that he did not represent to Valentine that he had handled breast-implant cases before she consulted with him about hers, but that he may have mentioned to her that he had handled other products-liability cases. He also stated in his affidavit that he had "filled in all the forms [he] received relating to the MDL and that he had sent them in"; that he "was vigilant in checking on [Valentine's] claim"; and that he exercised "the same level of reasonable care, skill, and diligence as other similarly situated legal service providers in the same general line of practice in the same general locality ordinarily have and exercise in a like case." On March 7, 2003, the trial court, without clarifying its grounds, entered a summary judgment in favor of Watters. Valentine appeals.
Valentine argues that this Court should determine: (1) whether her misrepresentation claim is governed by the ALSLA; (2) whether under the ALSLA she is required to present expert testimony on the question whether Watters was negligent as a matter of law in failing to timely file her paperwork with the MDL; and, (3) whether she is required under the ALSLA to present expert testimony to establish that Watters breached the duty of care he owed her.[3] *Page 389 
This Court reviews de novo a summary judgment. Sessions v.Espy, 854 So.2d 515, 521 (Ala. 2002).
 "`"`[W]e utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' and whether the movant was `entitled to judgment as a matter of law.' Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant."'"
Id. (quoting Hollingsworth v. City of Rainbow City,826 So.2d 787, 789 (Ala. 2001), quoting other cases).
The movant, Watters, may satisfy his burden of production by submitting affirmative evidence that negates an essential element of the nonmovant's claim or by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of the nonmovant's claim. Ex parte General Motors Corp.,769 So.2d 903, 909 (Ala. 1999). Watters argues that Valentine's evidence is insufficient to establish her claim, because, he argues, under the ALSLA Valentine is required to present expert testimony as to the standard of care applicable to Watters and Watters's failure to meet that standard of care; Valentine did not do so.
Valentine argues that her claim that Watters misrepresented his level of expertise and thus fraudulently induced her to hire him is not governed by the ALSLA because, she says, at the time of the alleged misrepresentation, Watters had not yet agreed to represent Valentine. Thus, she argues, Watters fraudulently induced her to enter into the attorney-client relationship.[4] Valentine states that, because the attorney-client relationship did not exist at the time of the misrepresentation, the ALSLA does not apply to her claim. She argues that, therefore, her case should be governed by CrowneInvs., Inc. v. Bryant, 638 So.2d 873, 876 (Ala. 1994). She argues that in order to succeed on her claim she needs only to show the elements required to prove fraud pursuant to § 6-5-101, Ala. Code 1975: (1) There must be a misrepresentation; (2) the misrepresentation must concern a material fact; (3) the plaintiff must rely on the misrepresentation; and (4) the plaintiff must be damaged as a proximate result. Crowne Invs., Inc., 638 So.2d at 876-77.
In response, Watters argues that, in enacting the ALSLA, the Alabama Legislature specifically provided that all causes of action against legal-service providers are to be governed by the ALSLA. He also argues that all of the actions Valentine complains about occurred as the result of Watters's representing her in the breast-implant litigation. Therefore, Watters argues, even though Valentine framed her causes of action as assignment of common-law negligence and fraud, she is entitled to only one cause of action under the ALSLA.
"[T]he ALSLA applies to all actions against `legal service providers' alleging a breach of their duties in providing legal services." *Page 390 Sessions, 854 So.2d at 522; see also Cunningham v. Langston,Frazer, Sweet, Freese, P.A., 727 So.2d 800, 803 (Ala. 1999). Section 6-5-573, Ala. Code 1975, provides:
 "There shall be only one form and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning defined herein."
The term "legal service liability action" is defined as:
 "Any action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider's violation of the standard of care applicable to a legal service provider. A legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission. A legal services liability action embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory, available to a litigant in a court in the State of Alabama now or in the future."
Ala. Code 1975, § 6-5-572(1).
In Cunningham, this Court noted that, "from a plaintiff's perspective, the ALSLA applies to any claim originating from his receipt of legal services. This is evident from several provisions throughout the Act, such as the section setting out the standard of care [§ 6-5-572(3)a. and b.]" 727 So.2d at 803. Specifically, § 6-5-572(3)a. and b. provide:
 "a. The standard of care applicable to a legal service provider is that level of such reasonable care, skill, and diligence as other similarly situated legal service providers in the same general line of practice in the same general locality ordinarily have and exercise in a like case.
 "b. However, if the legal service provider publishes the fact that he or she is certified as a specialist in an area of the law or if the legal service provider solicits business by publicly advertising as a specialist in the area of the law, the standard of care applicable to such legal service provider shall be such reasonable care, skill and diligence as other legal service providers practicing as a specialist in the same area of the law ordinarily have and exercise in a like case."
Pursuant to § 6-5-580, Ala. Code 1975, it is the plaintiff's burden to prove that the legal-service provider breached the applicable standard of care. Expert testimony is required to establish that the legal-service provider deviated from the applicable standard of care. Tonsmeire v. AmSouth Bank,659 So.2d 601, 605 (Ala. 1995).
In this case, Valentine concedes in her brief to this Court that her action against Watters is a legal-malpractice action. She argues, however, that Watters's misrepresentation occurred before she and Watters entered into an attorney-client relationship. Citing Cunningham, she argues that "[t]he tort predates the receipt of legal services and does not arise out of legal services." (Valentine's brief, p. 16.)
Cunningham involved a dispute between two law firms over an agreement to divide the fees in a case. In Cunningham, this Court thoroughly addressed the applicability of the ALSLA to actions against legal-service providers. We explained that, while the ALSLA applies to actions against legal-service providers where a plaintiff alleges that there has been a breach of the legal-service provider's duty in providing legal services, it does not apply to all actions filed against legal-service providers by someone whose claim does not arise out of the receipt of legal services. Cunningham, 727 So.2d at 804. *Page 391 
Further, we stated that the "legal actions" the Legislature was concerned about in enacting the ALSLA are actions against attorneys in their professional capacities. Id.
In this case, Valentine alleges that Watters's misrepresentation at their initial consultation does not fall under the purview of the ALSLA because, she argues, she had not yet hired Watters and they had not yet entered into an attorney-client relationship. Despite Valentine's contentions, it appears that the ALSLA controls her misrepresentation claim. The ALSLA applies to any claim originating as the result of the plaintiff's receipt of legal services. Moreover, the ALSLA expressly contemplates that the standard of care applicable to a particular attorney is, in part, based on whether the attorney represents to the community, or "publishes," that he or she is specialized in a particular area of the law. See § 6-5-572(3)b., Ala. Code 1975. An attorney's representations to a potential client are governed by the ALSLA. The mere existence or nonexistence of an express contract, employment, the payment of legal fees, or the length of the consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship. Green v. MontgomeryCounty, 784 F.Supp. 841, 846 (M.D.Ala. 1992). Thus, Valentine's misrepresentation claim is governed by the ALSLA.
Valentine argues that the requirement that expert testimony from a similarly situated legal-service provider is necessary to establish that an attorney breached the applicable standard of care does not apply when the defendant attorney is negligent as a matter of law. In support of this argument, Valentine cites only a Mississippi case, Thompson v. Erving's Hatcheries, Inc.,186 So.2d 756 (Miss. 1966). Valentine further argues, however, that her case is analogous to medical-malpractice suits and that the exception applied in those cases to the requirement of expert testimony should also apply to legal-malpractice cases. See Exparte HealthSouth Corp., 851 So.2d 33, 38 (Ala. 2002) (stating that expert testimony is not required in a case "`"where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and expertise to understand it."'" (quoting Tuscaloosa Orthopedic Appliance Co.v. Wyatt, 460 So.2d 156, 161 (Ala. 1984))). Finally, Valentine argues that she is not required to present expert testimony that Watters breached the standard of care, because, she argues, expert testimony is not needed to assist the trier of fact to understand that misrepresenting the truth is a breach of the standard of care an attorney owes to a client.
In response, Watters argues that legal-malpractice cases differ from medical-malpractice cases because legal analysis of the plaintiff's underlying claim is required to determine if the claim is meritorious. Presumably, following Watters's logic, if the underlying case lacks merit, then the plaintiff is not harmed by the attorney's alleged malpractice.
Alabama's statutory scheme for establishing a breach of the applicable standard of care in legal-malpractice actions is similar to the requirements imposed by the Medical Liability Act of 1987, §§ 6-5-540 to 6-5-552, Ala. Code 1975, for medical-malpractice actions. Section 6-5-548(a), Ala. Code 1975, a part of the Medical Liability Act of 1987, states that the plaintiff in a medical-malpractice action has the burden of proving that a health-care provider failed to exercise the same standard of care as other similarly situated health-care providers in the same general line of practice. Section 6-5-548
does not expressly state that the plaintiff, in order to satisfy its burden, must present expert *Page 392 
testimony from a similarly situated health-care provider. Section6-5-548(e) provides:
 "A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on breach of the standard of care only if he or she is a `similarly situated health care provider as defined above.'"
However, this Court has consistently required a medical-malpractice plaintiff to produce expert medical testimony to establish the applicable standard of care in order to satisfy its burden of proof pursuant to § 6-5-548. Ex parteHealthSouth, 851 So.2d at 37; Anderson v. Alabama ReferenceLabs., 778 So.2d 806 (Ala. 2000); Allred v. Shirley,598 So.2d 1347, 1350 (Ala. 1992). In doing so, we have noted that medical expertise is necessary to determine whether the doctor who allegedly committed malpractice has breached the applicable standard of care. Ex parte HealthSouth, 851 So.2d at 40.
In Rosemont, Inc. v. Marshall, 481 So.2d 1126, 1129-30 (Ala. 1985), this Court noted that "an exception to the foregoing general rule [requiring expert testimony] has been recognized where the want of skill or lack of care is so apparent as to be within the comprehension of the average layman and thus requires only common knowledge and experience to understand it." The Court noted that this exception has generally been applied in cases of res ipsa loquitur, cases where the injury complained of is in no way connected to the condition of which the plaintiff complains, and cases where the plaintiff introduces recognized medical treatises to prove whether a certain procedure is improper. 481 So.2d at 1130. In Holt v. Godsil, 447 So.2d 191 (Ala. 1984), this Court stated that a plaintiff who is a medical expert qualified to evaluate the appropriate standard of care need not present additional expert testimony in support of his or her claim.
Recently, this Court in Ex parte HealthSouth Corp., supra, stated that it was obvious that expert testimony was not needed to support a claim that nurses had breached the standard of care in failing to respond to the plaintiff patient's repeated calls for assistance. 851 So.2d at 39. We stated that "[a] jury could use `common knowledge and experience' to determine whether the standard of care was breached in this case, where custodial care, not medical care, is at issue." Id.
The expert-testimony requirement in medical-malpractice actions predates the enactment of the Medical Liability Act of 1987 and its predecessor, the Alabama Medical Liability Act, which was enacted in 1975. Parrish v. Spink, 284 Ala. 263, 266-67,224 So.2d 621, 623 (1969); Snow v. Allen, 227 Ala. 615, 151 So. 468
(1933); Sellers v. Noah, 209 Ala. 103, 95 So. 167 (1923). The recognized exceptions to the expert-testimony rule in medical-malpractice cases also predate the Legislature's enactment of those statutes. See id. "`When the Legislature readopts a code section, or incorporates it into a subsequent Code, prior decisions of this court permeate the statute, and it is presumed that the legislature deliberately adopts the statute with knowledge of the court's interpretation thereof.'" Jones v.Conradi, 673 So.2d 389, 392 (Ala. 1995) (quoting Edgehill Corp.v. Hutchens, 282 Ala. 492, 495-96, 213 So.2d 225, 227-28
(1968)).
Section 6-5-580, Ala. Code 1975, a part of the ALSLA, states that the plaintiff has the burden of proving that the legal-service provider breached the standard of care. Like the Medical Liability Act of 1987, § 6-5-580 does not expressly provide that the plaintiff must present expert testimony in support of a legal-malpractice claim. Nevertheless, this Court has held numerous times that expert testimony is required to establish that an attorney has *Page 393 
deviated from the applicable standard of care. Green v. Ingram,794 So.2d 1070 (Ala. 2001); see also Tonsmeire v. AmSouth Bank, 659 So.2d at 605 (adopting trial court's order stating that "[e]xpert testimony is required in order to establish deviation from a standard of care in connection with [an] alleged breach [of an attorney's standard of care]"); McDowell v. Burford,646 So.2d 1327 (Ala. 1994) (stating that the plaintiff in a legal-malpractice action must rebut the defendant's prima facie showing with expert testimony); Peoples v. Nassaney,638 So.2d 879 (Ala. 1994) (stating that a summary judgment was proper because the plaintiff failed to counter the defendant attorney's affidavit with that of an expert); Bodana v. Howie,638 So.2d 749 (Ala. 1992); Rice v. Hartman, Fawal, Spina, 582 So.2d 464
(Ala. 1991); Tidwell v. Waldrop, 554 So.2d 1009, 1010 (Ala. 1989). Thus, because Watters made a prima facie showing in his affidavit that he did not breach the applicable standard of care, Valentine would generally be required to provide expert testimony that Watters did in fact breach that standard of care.
However, Valentine asks this Court to apply to legal-malpractice actions the general exception applicable in a medical-malpractice action, "`in a case where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it.'" Dimoff v. Maitre, 432 So.2d 1225, 1226-27
(Ala. 1983) (quoting Lloyd Noland Found., Inc. v. Harris,295 Ala. 63, 66, 322 So.2d 709, 711 (1975)).
Many other jurisdictions recognize a "common knowledge" exception to the requirement that a plaintiff in a legal-malpractice case must present expert testimony. McIntyrev. Rumsey, 80 P.3d 1201 (Kan.Ct.App. 2003) (unpublished opinion) (stating that expert testimony is not necessary where the attorney's breach of duty is so clear and obvious that the determination that the attorney deviated from the standard of care is within the common knowledge of the trier of fact);Dubreuil v. Witt, 80 Conn.App. 410, 418, 835 A.2d 477, 483
(2003) (stating that the exception to the need for expert testimony applies when "the defendant's conduct was such an obvious and gross want of care and skill that the neglect would be clear to the average layperson"); Roberts v. Hutton,152 Ohio App.3d 412, 423, 787 N.E.2d 1267, 1276 (2003) ("The only exception to this [expert-testimony] requirement is when the alleged breach of care is so obvious that it can be determined from the ordinary knowledge and experience of laymen."); Mazuca Assocs. v. Schumann, 82 S.W.3d 90, 97 (Tex.Ct.App. 2002) ("Expert testimony is not required if the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge."); Hall v. Fedor,349 S.C. 169, 561 S.E.2d 654 (S.C.Ct.App. 2002) (noting that expert testimony is normally required to establish the applicable standard of care except when the matter is within the common knowledge of laypersons).
Watters argues, and we agree, that expert testimony is generally required in a legal-malpractice case because a jury that is unfamiliar with the principles of law governing the underlying case might be incapable of discerning whether a lawyer's professional conduct falls outside an acceptable standard of care. Generally, an expert may testify when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Ala. R. Evid. 702. However, "Alabama historically and generally has refused expert testimony or opinion on a subject that is within the understanding of the average *Page 394 
layperson." Ala. R. Evid. 702, Advisory Committee's Notes.
Whether Valentine would have prevailed in the MDL litigation is a question which is within the understanding of a jury; therefore, Valentine need not present expert testimony on this issue. See Whitley v. Chamouris, 265 Va. 9, 11, 574 S.E.2d 251,253 (2003) ("a plaintiff must present sufficient evidence to convince the fact finder in the malpractice case that he would have prevailed in the underlying case absent the attorney's alleged negligence").[5] In the case before us, the evidence suggests that Watters missed the deadline for filing Valentine's registration forms to include her in the class-action suit. There is also evidence indicating that Valentine's status in the MDL was affected by Watters's failure to timely file her paperwork. It appears that had Watters timely filed Valentine's paperwork for participation in the MDL, she would have been classified as a "current registrant" rather than as a "late registrant." Failure to timely file an action is a matter within the common knowledge of the average layperson. In Mazuca, the Texas Court of Appeals, citing caselaw from seven other jurisdictions, noted that "[m]issing the statute of limitations is a classic example of negligence that any layperson can understand." 82 S.W.3d at 97; see also Little v. Matthewson,114 N.C.App. 562, 442 S.E.2d 567, 571 (1994) (citing caselaw from five other states in support of the common-knowledge exception).
We are persuaded by our earlier analyses under the medical-services-liability cases and by other courts' application of that same kind of analysis to legal-services-liability cases that an exception to the general requirement that a plaintiff present expert testimony in support of a legal-malpractice claim occurs where a legal-service provider's want of skill or lack of care is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it. Whether Watters failed to file the requisite forms for Valentine to participate in the MDL is a question of fact for the jury to decide, and whether such a failure to timely file violates the applicable standard of care is a question that ordinarily does not require expert testimony.
Valentine also argues that she need not produce expert testimony to assist the trier of fact to understand that misrepresenting the truth is a breach of the standard of care an attorney owes to his client. Valentine and Watters disagree as to whether Watters represented that he had experience in breast-implant litigation. Valentine states that Watters told her that he had represented other clients in breast-implant litigation, while Watters states that he told Valentine only that he had represented clients in products-liability litigation. Whether Watters misrepresented his qualifications to Valentine is also a question for the jury.
Valentine appeals the trial court's summary judgment in favor of Watters; therefore, we must review Valentine's version of the facts as stated in the record before us in the light most favorable to her. See Ex parte General Motors Corp., 769 So.2d at 905. Accepting Valentine's claim that *Page 395 
Watters told her that he had represented prior clients in litigation involving breast implants and that he later admitted he had not, we conclude that Valentine is not required to present expert testimony to support her claim that Watters breached the applicable standard of care in misrepresenting his qualifications to her in this manner. We hold that a trier of fact with common knowledge and experience could determine that an attorney's representation that he or she has had experience in a certain type of litigation, when that representation is not true, violates the standard of care. Accordingly, we reverse the trial court's summary judgment and remand this case for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
[1] As a current registrant, Valentine would have been able to choose either a one-time payment of $50,000, plus an additional $3,000 explanation benefit, or a $75,000 long-term benefit. As a late registrant, Valentine is entitled to the $75,000 long-term benefit, but her benefit is payable only if, and after, the manufacturers' cumulative payments to current registrants do not exceed the manufacturers' respective maximum obligations. Valentine has yet to receive any moneys under the MDL settlement.
[2] It appears from the record that the trial court never ruled on Valentine's motion for a summary judgment.
[3] Valentine does not provide any authority in support of the third issue she raises on appeal — whether under the ALSLA she is required to present expert testimony to establish that Watters breached the duty of care; however, we view this issue as a variant of her argument that the ALSLA does not require her to present expert testimony to the effect that Watters was negligent as a matter of law in failing to timely file her MDL paperwork.
[4] Valentine's complaint does not include a separate fraudulent-inducement claim. However, she argues in her brief to this Court that she was fraudulently induced to retain Watters.
[5] Whitley recognizes that a legal-malpractice case "involves a `case within the case.'" 265 Va. at 11,574 S.E.2d at 252. Both the plaintiff and the defendant are entitled to present evidence that would have been presented in the underlying action. In addition, the defendant is entitled to assert defenses that would have been presented in the underlying action. Id. Section6-5-579(b), Ala. Code 1975, contemplates this "case within the case" concept: "In defense of the underlying action, the legal services provider may assert any and all substantive and procedural defense, restriction, limitation, or immunity which could have the effect of limiting, mitigating, reducing, or avoiding liability or damages."